UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PRAIRIE BAND POTAWATOMI NATION<br>16281 Q Road<br>Mayetta, Kansas 66509<br><br>        Plaintiff,<br><br>   v.<br><br>STEVEN T. MNUCHIN, in his official capacity<br>as SECRETARY, UNITED STATES<br>DEPARTMENT OF THE TREASURY<br>1500 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20220<br><br>        Defendant. | Case No.:<br><br><br>COMPLAINT FOR MONETARY,<br>DECLARATORY AND INJUNCTIVE<br>RELIEF |

Plaintiff, Prairie Band Potawatomi Nation ("Prairie Band Potawatomi"), a federally recognized sovereign Indian nation, by and through its counsel, states and alleges as follows:

## INTRODUCTION

1.    The Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. 116-136, 134 Stat. 281 (2020), was signed into law on March 27, 2020, to provide economic relief for American workers, families, small businesses, and Tribal, state, and local governments impacted by the COVID-19 pandemic.

2.    Pursuant to Title V of the CARES Act, Congress appropriated $8 billion in direct aid to Tribal governments ("Title V Funds").  42 U.S.C. § 801(a)(2)(B).

3.    Congress directed the United States Secretary of Treasury, Steven T. Mnuchin, ("Secretary Mnuchin" and "Treasury"), to consult with Tribal governments and the United States

Secretary of the Interior in order to determine each Tribal government's allocation of the Title V Funds.  42 U.S.C. § 801(c)(7).

4.     Treasury initially solicited data from Tribal governments, including their enrolled population, for the purpose of allocating Title V Funds.  Many eligible Tribal governments, including Plaintiff, responded by providing their actual tribal enrollment ("Actual Tribal Enrollment Metric" or "ATE Metric") to Treasury and affirmed the veracity of their submissions.

5.     While Treasury ultimately decided to award sixty percent of Title V Funds on the basis of "Tribal population" ("Population Award"), Treasury elected to ignore the ATE Metric, which was the only justifiable metric for measuring the scope of Tribal government responsibility for its citizens impacted by COVID-19.

6.     Instead, Treasury used an arbitrary and capricious metric from the Indian Housing Block Grant program ("IHBG Metric"), which does not even purport to capture Tribal population. (*Coronavirus Relief Fund Allocations to Tribal Governments*, United States Department of the Treasury (May 5, 2020) ("Allocation Document") at p. 2-3.   Indeed, the IHBG Metric assigns a population value of zero to twenty-five federally recognized Tribal governments, which is absurd on its face.

7.     Rather than counting the individuals enrolled in a tribe, the IHBG Metric begins with the Census projection of the number of individuals who consider themselves "American Indian or Alaska Native" ("AIAN") on Census forms (within a certain geographic area). 24 C.F.R. § 1000.330.  This is a racial categorization that is neither necessary nor sufficient to count Tribal population.  It undercounts enrolled individuals who may select different racial classifications on the Census form, and it also overcounts individuals who select AIAN but are not enrolled in a

Tribal government.   Furthermore, it is limited to a geographic area that does not coincide with a Tribal government's responsibility to its enrolled members.

8.      The IHBG Metric is further limited to estimated AIAN in a gerrymandered "formula area" associated with a Tribal government (*d*.).   The "formula area" consists of (i) a Tribal Government's formula area as it existed in 2003 (24 C.F.R. § 1000.302(3)); (ii) nine static categories of property (§ 1000.302(1) (i - ix)); and (iii) areas added by application of a Tribal government and at the discretion of HUD (§ 1000.302(2)).   Then, the IHBG Metric is artificially capped at "**twice a…tribe's enrolled population**" (24 C.F.R. § 1000.302(5) (emphasis added)).

9.      The IHBG Metric is an algorithm – not a tally, or even projection, of "Tribal population."   Indeed, the machinations underlying the IHBG Metric yield fractional values.   For example, the IHBG Metric for Plaintiff is, most precisely, 882.668903225806.

10.     In short, the IHBG Metric is not a suitable proxy for those persons who are served by a Tribal government.

11.     Treasury's qualitative error drives enormous quantitative differences in the allocation of Title V Funds based on the formula adopted by Treasury.   This discrepancy has been independently documented by the Harvard Project on American Indian Economic Development ("HPAIED").[1]

12.     The disparity between the IHBG Metric and ATE Metric caused severe consequences for Plaintiff, Prairie Band Potawatomi.   According to the IHBG Metric released by Treasury at the time of the Population Award, Treasury assigned a population of 883 to Prairie Band Potawatomi.   This figure is 80% lower than Prairie Band Potawatomi's population of 4,561,

---

[1] Randall K.Q. Akee, Eric C. Henson, Miriam R. Jorgenson & Joseph P. Kalt, Policy Brief No. 2: Dissecting the US Treasury Department's Round 1 Allocations of CARES Act COVID-19 Relief Funding for Tribal Governments (2020).

as of the date that Prairie Band Potawatomi's ATE Metric was solicited by Treasury.  As a result, Prairie Band Potawatomi received an allocation of $2,456,891, which according to the HPAIED report, is $7,647,063 less than Prairie Band Potawatomi would have received if Treasury had considered Prairie Band Potawatomi's enrollment.[2]

13.    In this action, brought pursuant to Administrative Procedures Act, 5 U.S.C. § 701 et seq., Prairie Band Potawatomi challenges (i) Treasury's reliance on the IHBG Metric because it is an arbitrary and capricious agency action, which was contrary to statutory authority, that should be set aside by this Court (5 U.S.C. §§ 706(2)(A), 706(2)(C) and (ii) Treasury's faulty consultation process that violated statutory authority, was contrary to lawful procedure and an arbitrary and capricious implementation of statutory authority and obligations.  *Id*. at §§706(2)(A), 706(2)(C), 706(2)(D).

14.    In this action, Plaintiff seeks (i) nullification of the Allocation Document; (ii) the reallocation of remaining Title V Funds for distribution based on actual tribal population; and (iii) specific monetary relief in the amount of $7,647,063.

15.    Upon information and belief, $533 million of Title V Funds remain in the possession of the Treasury, subject to ongoing litigation concerning the entitlement of Alaska Native Corporations ("ANCs") to Title V Funds (the "Chehalis Litigation") (*Confederated Tribes of the Chehalis Reservation, et al. v. Mnuchin*, D.D.C., Case No. 1:20-cv-01002-APM). *Miccosukee Tribe of Indians of Florida v. Mnuchin*, D.D.C., Case No. 1:20-cv-2792-APM, Dkt. 40 (Joint Status Report).

16.    The D.C. Circuit most recently held that ANCs are not entitled to Title V Funds. *Confederated Tribes of the Chehalis Reservation v. Mnuchin*, 976 F.3d 15, 25 (D.C. Cir. 2020).

---

[2] *Id*. at p. 10, Table 5.

The ANCs have filed a petition for writ of certiorari to the Supreme Court of the United States ("Supreme Court") (Case No. 20-544).  The writ of certiorari has been fully briefed and awaits decision from the Supreme Court.

## JURISDICTION AND VENUE

17.     The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1362. The Prairie Band Potawatomi is a federally recognized Tribal government maintaining a government-to-government relationship with the United States.  The Prairie Band Potawatomi asserts claims arising under the Constitution and laws of the United States including the Administrative Procedure Act, 5 U.S.C. § 701 et seq.  The allegations of the Complaint give rise to an actual controversy within the meaning of 28 U.S.C. § 2201.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(e) because the Secretary of the United States Department of the Treasury is an officer of the United States and because a substantial part of the actions or omissions giving rise to the claims occurred in this District, a substantial part of the property that is the subject of this action is located in this District, and Secretary Mnuchin maintains his principal place of business in this District.

## PARTIES

19.     Plaintiff, Prairie Band Potawatomi Nation, is a federally recognized Tribal government, which provides essential governmental services to its 4,561 enrolled citizens living on and off-reservation.  The Prairie Band Potawatomi possesses sovereign authority over its reservation located in Northeast Kansas.  The Prairie Band Potawatomi brings this action to assert and protect its own rights and the rights of its citizens.

20.     Defendant, Steven T. Mnuchin, is the Secretary of the United States Department of the Treasury and is sued in his official capacity.  Treasury was directed by Congress to consult with Tribal governments and the Secretary of the Interior to develop a rational formula for distributing the Title V funds to the 574 federally recognized Tribal governments.  Treasury's decision to distribute Title V funds based upon the incomplete and unreliable IHBG Metric was arbitrary and capricious because Treasury possessed, or had access to, more accurate and reliable Tribal population data, including the data submitted directly by Tribal governments at Treasury's own request.

## BACKGROUND

### A. The CARES Act and the Title V Coronavirus Relief Fund

21.     Title V of the CARES Act amends the Social Security Act (42 U.S.C. 301 et seq.), and appropriates $150 billion for "payments to States, Tribal governments, and units of local government."  42 U.S.C. § 801(a)(1).

22.     Title V defines "Tribal governments" as "the recognized governing body of an Indian tribe."  *Id*. § 801(g)(5).  The Prairie Band Potawatomi is a federally recognized Tribal government entitled to receive Title V Funds proportionate to a rational and reasonable tally of its total population.

23.     Of the $150 billion, Congress set aside $8 billion for direct payments to Tribal governments.  *Id*. § 801(a)(2)(B).

24.     Although Congress mandated that Treasury use United States Census Bureau population data for determining the distribution of Title V Funds to States and units of local government (42 U.S.C. § 801(8)), there was no such requirement for distributions to Tribal

governments.[3]   Instead, Treasury was given authority—but only in consultation with the Department of the Interior and Tribal governments—to determine the appropriate allocation based on increased expenditures due to the COVID pandemic.  *Id*.  Specifically, Congress directed:

> From the amount set aside under subsection (a)(2)(B) for fiscal year 2020, the amount paid under this section for fiscal year 2020 to a Tribal government shall be the amount the Secretary shall determine, *in consultation with the Secretary of the Interior and Indian Tribes,* that is *based on increased expenditures of each such Tribal government* … relative to aggregate expenditures in fiscal year 2019 by the Tribal government … and determined in such manner as the Secretary determines appropriate to ensure that all amounts available under subsection (a)(2)(B) for fiscal year 2020 are distributed to Tribal governments.

42 U.S.C. §801(c)(7) (emphasis added).

25.    Such funds were restricted to expenses incurred from March 1, 2020 to December 2020 that were incurred due to the public health emergency associated with COVID-19 and that "were not accounted for in the budget most recently approved" by the respective Tribal government.  42 U.S.C. §801(d).  The cut-off date for such expenditures was subsequently extended to December 31, 2021.[4]

---

[3] Tribal governments are treated as a distinct category from state and local governments in Title V. *See e.g. Id*. at § 801(a)(1) (referencing payments to "States, Tribal governments, and units of local government").

[4] The second stimulus, H.R. 133, amended the Cares Act as follows:

> SEC. 1001. CORONAVIRUS RELIEF FUND EXTENSION.
>     Section 601(d)(3) of the Social Security Act (42 U.S.C. 801(d)(3)) is amended by striking ``December 30, 2020'' and inserting ``December 31, 2021''.

Consolidated Appropriations Act, 2021, H.R. 133, 116th Cong., Title X, §1001

26.     Reading §801(c)(7) and §801(d) in conjunction, Congress tasked Treasury with projecting and paying (§801(c)(7)) a specific, quantifiable value (§801(d)) that would be subject to oversight by the Office of the Inspector General and recoupment (§801(f)).

**B. Treasury Solicits Information from Tribal Governments**

27.     As directed by Congress, on April 2, 2020 and April 9, 2020 Treasury, and the Office of the Assistant Secretary—Indian Affairs, United States Department of the Interior, held telephonic consultation sessions, where federal officials heard from representatives of Tribal governments from across the United States. Treasury also solicited written comments from Tribal governments regarding their views on potential methodologies for the allocation of Title V Funds.

28.      On April 8, 2020, Prairie Band Potawatomi provided Treasury with a suggested methodology for allocating the Title V Funds. Prairie Band Potawatomi also participated in both consultation sessions.

29.     Following the conclusion of the consultation period, on April 13, 2020, Treasury published a form entitled "Certification for Requested Tribal Data" on its website.   The "Certification for Requested Tribal Data" sought individualized enrollment data from all 574 federally recognized Tribal governments.

30.     The Prairie Band Potawatomi provided the requested data to Treasury prior to Treasury's April 17, 2020, deadline.   The Prairie Band Potawatomi Nation Tribal Council Chairman Joseph P. Rupnick certified Plaintiff's Actual Tribal Enrollment Metric as being 4,561.

**C. Treasury Changes Course and Uses the IHBG Metric**

31.     On May 5, 2020, Treasury released its plan to allocate Title V Funds in the Allocation Document.

32.     Treasury elected to award sixty percent of the Title V Funds, or $4.8 billion, "based on tribal population" because "Tribal population [was] expected to correlate reasonably well with the amount of increased expenditures of Tribal governments related directly to the public health emergency, such as increased costs to address medical and public health needs."[5]

33.     Despite requesting enrollment data from Tribal governments only weeks earlier, and without any notice whatsoever to Tribal governments, Treasury elected to allocate the Population Award based "on population data used in the distribution of the Indian Housing Block Grant[.]" [6]

34.     According to Treasury, Treasury adopted the IHBG Metric because it was purportedly a "reliable and consistently-prepared" metric, even though twenty-five Tribal governments are listed as having a population of zero, a practical impossibility.  (Allocation Doc., p. 2.)  The presence of population values of zero evidences the facial unreliability of the IHBG Metric.

35.     In selecting the IHBG Metric, Treasury ignored other datasets that are "reliable and consistently-prepared" including HUD-maintained enrollment data ("HUD Enrollment Metric") that were maintained to reflect population rather than housing demand.

36.     At the time of the Population Award, Treasury failed to provide any reason for its rejection of the Actual Tribal Enrollment Metric and HUD Enrollment Metric.  And it failed to give Tribal governments any advance notice that it might utilize the ill-fitting IHBG Metric, rather

---

[5] U.S Dept. of the Treasury, Coronavirus Relief Fund Allocations to Tribal Governments, https://home.treasury.gov/system/files/136/Coronavirus-Relief-Fund-Tribal-Allocation-Methodology.pdf, (last visited May 30, 2020).
[6] U.S. Dept. of the Treasury, Joint Statement by Treasury Secretary Steven T. Mnuchin and Secretary of the Interior David L. Bernhardt on Distribution of Coronavirus Relief Fund Dollars to Native American Tribes, https://home.treasury.gov/news/press-releases/sm998, (last visited Jun. 3, 2020).

than using the ATE Metric, which Treasury had solicited only weeks prior during Treasury's purported consultation with Tribal governments.

37.     On May 5, 2020, the very same day that Treasury released its Allocation Document, Treasury announced the first round of funding, consisting of $4.8 billion.  Pursuant to Treasury's Population Award allocation,[7] the Prairie Band Potawatomi received $2,456,891, based on an assumed population of 883 ($2,782.44 per IHBG unit), which undercounted the Nation's actual population by 80%.  Had Treasury used the Prairie Band's enrollment, the Nation would have received approximately $7,647,063 more.

### D. Academic Experts Criticize Treasury's Arbitrary and Capricious Reliance on the IHBG Metric

38.     A report by the Harvard Project on American Indian Economic Development, in collaboration with the University of Arizona Native Nations Institute, titled "Policy Brief No. 2: Dissecting the US Treasury Department's Round 1 Allocations of CARES Act COVID-19 Relief Funding for Tribal Governments" ("HPAIED Paper 2"), analyzed and heavily criticized Treasury's decision to use the IHBG Metric for the purpose of determining each Tribal government's Population Award.[8]

39.     The HPAIED Paper 2 concluded that: (1) the use of different, publicly available, population datasets had a significant impact on the amount of funding each Tribal government received; (2) Treasury's decision to use IHBG data prepared for the allocation of HUD housing monies, and derived from racial population data, resulted in "a number of tribes receiving *de*

---

[7] U.S. Dept. of the Treasury, Coronavirus Relief Fund Allocations to Tribal Governments, (2020), at p. 2, https://home.treasury.gov/system/files/136/Coronavirus-Relief-Fund-Tribal-Allocation-Methodology.pdf, (last visited Jun. 3, 2020).

[8] Randall K.Q. Akee, et. al., Policy Brief No. 2: Dissecting the US Treasury Department's Round 1 Allocations of CARES Act COVID-19 Relief Funding for Tribal Governments (2020).

*minimis payments*" that did not reflect the actual population of Tribal governments or Tribal needs; (3) "Treasury's decision to use racial population data from HUD's IHBG dataset demonstrably produce[d] arbitrary and capricious allocations of CARES Act funds across tribes."[9]

40.     The HPAIED Paper 2 uses the example of the Delaware Tribe of Indians (Eastern) to demonstrate the "gross anomalies" produced by Treasury's use of race-based datasets rather than Tribal government enrollment data: "[A]ccording to the IHBG dataset utilized by Treasury, the Delaware Tribe of Indians (Eastern)…has an enrolled population of more than 11,000 tribal citizens[.]"[10]  The IHBG dataset, which reflects a population of zero for the Delaware Tribe, dictated a minimum Population Award of $100,000.  In contrast, if Delaware Tribe's Population award were based on the HUD Enrollment Metric, the Delaware Tribe would have received approximately $24 million, instead of the $100,000 allocated by Treasury."[11]

41.     HPAIED Paper 2 argues that Treasury's approach "creates demonstrable inequity in the form of gross and frequent 'under-representation' and 'over-representation' of hundreds of tribes in the allocation process[.]"[12]  Overall, the HPAIED Paper 2 maintains that the most accurate count of Tribal government population is enrollment because this is the true measure of "the population to which tribal governments are responsible and over which they have jurisdiction."[13]

42.     In a subsequent HPAIED Policy Brief (HPAIED Paper 3), HPAIED concluded that Tribal enrollment should be used as the proper metric for determining any population-based

---

[9] *Id*. at p. 2.
[10] *Id*. at p. 7.
[11] *Id*.
[12] *Id*. at p. 13.
[13] *Id*. at p. 14.

allocation of Title V Funds.[14]  "Tribes are governing entities, populated by citizens—persons to which tribal governments owe duties of service and over whom they have jurisdiction."[15]  A Tribal government's obligations to its citizens does not end at the reservation line, as "tribe after tribe is reaching beyond its geographic borders to serve their off-reservation citizens[.]"[16]  Thus, "the appropriate measure of population in a sound allocation formula is the number of enrolled tribal citizens immediately before the coronavirus pandemic struck the U.S."[17]

43.     Conversely, the use of the IHBG Metric, which "focuses on the racial make-up of the residents of reservations and related tribal areas" is "appropriate for purposes of a federal housing program" but it is "wholly inappropriate data for the purposes of federal funding—i.e., the CARES Act—that is explicitly aimed at supporting the economic stability and function of tribal governments."[18]

**E. Prairie Band Potawatomi Members are Grossly Undercounted by the IHBG Metric**

44.     As noted, the IHBG Metric relied upon by Treasury to distribute the Population Award to the Prairie Band Potawatomi used the single-race data category and indicated a total population of 883.[19]  This compares to its actual enrollment of 4,561.

---

[14] Randall K.Q. Akee, Eric C. Henson, Miriam R. Jorgenson & Joseph P. Kalt, Policy Brief No. 3: Proposal for a Fair and Feasible Formula for the Allocation of CARES Act COVID-19 Relief Funds to American Indian and Alaska Native Tribal Governments (2020).
[15] *Id*. at p. 6.
[16] *Id*.
[17] *Id*.
[18] *Id*. (emphasis in original)
[19] U.S Dept. of the Treasury, Coronavirus Relief Fund Allocations to Tribal Governments, (2020), fn. 9, https://home.treasury.gov/system/files/136/Coronavirus-Relief-Fund-Tribal-Allocation-Methodology.pdf, (last visited Jun. 3, 2020).

45.     Prairie Band Potawatomi's "formula area" is limited to an 11 by 11 mile tract  in Northeast Kansas, within Jackson County[20]  The IHBG Metric fails to account for Tribal citizens who reside outside of that formula area even though the Prairie Band Potawatomi provides services to *all* of its citizens, regardless of where they reside.

46.     Prairie Band Potawatomi has limited its participation in the IHBG program.  The Prairie Band Potawatomi has only 17 HUD-funded housing units on its reservation.  The IHBG Metric, based on Census numbers, is also skewed against Tribal governments whose citizens refuse to take part in Census data gathering or who do not participate at all in the IHBG program, which is voluntary.

47.     As a result, Treasury grossly undercounted the Prairie Band Potawatomi's total enrolled population by 3,678, or approximately eighty percent.

48.     Upon information and belief, the Prairie Band Potawatomi was not the only Tribal government that was under-represented by the IHBG Metric relied upon by Treasury in distributing the Population Award.  A total of twenty-five Tribal governments received a population value of zero, a result which on its face demonstrates the fatal flaws in Treasury's methodology.

49.     Pursuant to Treasury's Population Award formula,[21] the Prairie Band Potawatomi received $2,456,891 based on the IHBG Metric of 883.

---

[20] The Dept. of Housing and Urban Development, FY 2020 IHBG Final Allocation Formula Area, (2020), at p. 19, https://www.hud.gov/sites/dfiles/PIH/documents/FY%202020%20Final%20 Summary%20-%20Formula%20Area.pdf, (last visited June 2, 2020).
[21] U.S Dept. of the Treasury, Coronavirus Relief Fund Allocations to Tribal Governments, (2020), at p. 2, https://home.treasury.gov/system/files/136/Coronavirus-Relief-Fund-Tribal-Allocation-Methodology.pdf, (last visited Jun. 3, 2020).

50.     Had Treasury used enrollment numbers[22] Prairie Band Potawatomi's Population Award would have been $7,647,063 greater.[23]

**F. Treasury's Post Hoc Rationalization**

51.     On June 4, 2020, after the Prairie Band Potawatomi challenged Treasury on its use of the flawed IHBG metric, Treasury released a document entitled: "Coronavirus Relief Fund Frequently Asked Questions on Tribal Population," ("FAQ"),[24] which, apparently, was intended to address criticism of Treasury's allocation methodology.

52.     The FAQ is simply a post hoc rationalization for Treasury's decision to rely on the race-based IHBG Metric, rather than the ATE Metric, as proxy for tribal population.  The FAQ conveys nothing more than the difference between the two, without connection to the task assigned by Congress to project changes in expenditure associated with the COVID-19 crisis (42 U.S.C. §§ 801(c)(7), 801(d)).[25]

**G. Treasury creates Judgment Fund**

53.     In its Second Allocation Document, dated June 12, 2020 (the "Second Allocation Document"), Treasury created a Judgment Fund in the amount of $679 million to compensate Prairie Band and similarly situated Tribal governments "in the event that any potentially adverse

---

[22] Indeed, HUD maintains its own set of enrollment numbers for the Prairie Band, and pegs Prairie Band's enrollment at 4,841. The Dept. of Housing and Urban Development, *FY 2020 Estimate Allocation Sheets* (2020).  HPAIED Paper 2 oomputes Prairie Band's loss at $7,647,063 using the HUD enrollment number.

[23] Randall K.Q. Akee, et. al., Policy Brief No. 2: Dissecting the US Treasury Department's Round 1 Allocations of CARES Act COVID-19 Relief Funding for Tribal Governments, p. 10, Table 4 (2020).

[24] The Dept. of the Treasury, Coronavirus Relief Fund Frequently Asked Questions on Tribal Population, June 4, 2020, https://home.treasury.gov/system/files/136/FAQ-on-Tribal-Population-Data.pdf, (last visited June 6, 2020).

[25] *See id.*

decision in litigation on this issue with respect to payments from the [Cares Act funds earmarked for Tribal governments]." *Shawnee Tribe v. Mnuchin*, No. 1:20-cv-1999-APM, Dkt. 3-4 (D.D.C. June 18, 2020) (Second Allocation Document); *see also Agua Caliente Band of Cahuilla Indians, et al. v. Mnuchin*, Case No. 1:20-cv-01136-APM, Dkt. 39, (D.D.C., June 12, 2020); *see Prairie Band Potawatomi Nation v. Mnuchin,* No. 20-CV-1491 (APM), Dkt. 29, pp. 4-6 (D.D.C. June 11, 2020) (Treasury' counsel proposing set aside for claims of undercounted tribes before Court's consideration of merits of Prairie Band Potawatomi's motion).

54.      Treasury thereby created a monetary remedy for the instant APA challenge.

### H. Prior and Pending Related Litigation

55.      On April 17, 2020, certain Tribal governments commenced actions that were subsequently consolidated in the Chehalis Litigation (D.D.C. Case No. 1:20-cv-1002).   The Chehalis Litigation will decide whether ANCs are the proper recipients of $533 million in Title V Funds that have been earmarked for them by Treasury.  If Chehalis Litigation is resolved in favor of the Tribal government parties, the $533 million will have to be allocated to Tribal governments.

56.      On June 8, 2020, only after attempting to resolve this matter with outreach to Treasury, Plaintiff Prairie Band Potawatomi commenced litigation raising similar claims to those set forth in the instant action.  *Prairie Band Potawatomi Nation v. Mnuchin*, Case No. 1:20-cv-01491 (D.D.C.) ("Prior PBPN Litigation").   The United States District Court for the District of Columbia denied Prairie Band Potawatomi's motion for a preliminary injunction seeking to restrain $3.2 billion of Title V Funds that had not yet been distributed on the grounds, *inter alia*, that Treasury's allocation methodology was committed to agency discretion by law and thus unreviewable under Section 701(a)(2) of the Administrative Procedure Act.   *Id.*, Dkt. 22; *see Prairie Band Potawatomi Nation v. Mnuchin*, No. 20-CV-1491 (APM), 2020 WL 3402298, at *1

(D.D.C. June 11, 2020).  Prairie Band Potawatomi voluntarily discontinued its action without prejudice on July 9, 2020. *Prairie Band Potawatomi Nation*, Case No. 1:20-cv-01491, Dkt. 30 (D.D.C.).

57.     On June 18, 2020, The Shawnee Tribe commenced an action in the United States District Court for the Northern District of Oklahoma challenging Treasury's allocation of Title V Funds to Tribal governments (the "Shawnee Litigation").  After the case was transferred to this Court, this Court denied Shawnee's motion for a preliminary injunction on the basis, *inter alia*, of non-reviewability under the Administrative Procedure Act, citing the Court's decision in the Prior PBPN Litigation case.  *Shawnee Tribe v. Mnuchin*, -- F. Supp. 3d --, No. 1:20-cv-1999-APM, 2020 WL 4816461 (D.D.C. Aug. 19, 2020) (denying preliminary injunction in identical case).  This Court then the dismissed the complaint.  *Shawnee Tribe v. Mnuchin*, No. 1:20-cv-1999-APM, 2020 WL 5440552 (D.D.C. Sep. 10, 2020) (dismissing identical case).  An expedited appeal of both determinations has been heard by the United States Court of Appeals for the District of Columbia. Based on the oral argument occurring on December 4, 2020, it appears likely that the appellate court will reverse the district court on the issue of reviewability.  No decision has yet been issued.

58.     On July 31, 2020, The Miccosukee Tribe of Indians of Florida commenced an action in the United States District Court for the Southern District of Florida (the "Miccosukee Litigation").  The Miccosukee Litigation was then transferred to this Court (Case 1:20-cv-02792-APM).  Plaintiff's motion for preliminary injunction in the Miccosukee Litigation remains pending, but the parties have agreed to hold that motion in abeyance based on the United States' agreement to provide notice to Shawnee and Miccosukee before distributing all ANC funds.

59.     The claims raised in the Shawnee Litigation and Miccosukee Litigation are virtually identical to those raised by Prairie Band Potawatomi in the instant litigation.

## I. Prairie Brand Potawatomi Has Standing to Bring This Action.

60.     Treasury's allocation formula has caused injury to the Prairie Band Potawatomi by reducing the Tribe's proportionate share of the Population Award.   Treasury's pending disbursement of the remainder of the Title V Funds threatens the Prairie Band Potawatomi with imminent, irreparable, injury because the exhaustion of Title V Funds may leave the Tribe without an adequate remedy.

61.     The Prairie Band Potawatomi has incurred and continues to incur significant, necessary expenditures due to the public health emergency with respect to COVID-19.  *See* 42 U.S.C. 801(d)(7).  The Tribe continues to provide essential services to its citizens regardless of their residence.

62.     The Prairie Band Potawatomi is entitled to its proportionate share of the Title V Funds based upon a reasonable allocation formula that bears a rational relationship to the actual enrollment population of the Tribe.  Congressional intent to provide emergency relief to Tribal governments is frustrated by the failure to use accurate Tribal population data because Tribal government COVID-19 response efforts are proportionately underfunded.

63.     Treasury is expected to disburse the remainder of the Title V Funds in the very near future.  If the ANC entities are denied relief by the Supreme Court, Treasury will distribute an additional $533 million to Tribal governments, which distribution would provide an opportunity for Treasury to correct the serious flaws in the initial distribution that give rise to this and the related litigations.  If this distribution were to occur before the D.C. Circuit decides the Shawnee appeal, the Prairie Band Potawatomi's claim to additional funds as set forth herein could be lost

forever.  It is therefore necessary for the Prairie Band Potawatomi to reassert its claim at this juncture without waiting for the expected reversal of the district court on the basis of reviewability.

## COUNT I: Declaratory and Injunctive Relief under 5 U.S.C. § 706, and 28 U.S.C. §§ 2201-2202

64.     Prairie Band Potawatomi restates and realleges the preceding paragraphs and allegations as if fully stated herein.

65.     The Administrative Procedure Act ("APA") authorizes judicial review of agency actions (5 U.S.C. § 702) except for "agency action…committed to agency discretion by law."

66.     Treasury's allocation of Title V Funds was not committed to agency discretion by law because Treasury's discretion to allocate funds was limited in at least two ways.  First, Congress tasked Treasury with projecting (42 U.S.C. §801(c)(7)) a specific, quantifiable value (§801(d)): the increase in expenditures incurred by Tribal governments as a result of COVID-19. 42 U.S.C. §801(c)(7).     Congress intended for this amount to be sufficiently objective and verifiable that it would be subject to oversight by the Office of the Inspector General and recoupment (§801(f)).  Second, Congress directed Treasury to consult with the Secretary of the Interior and Indian Tribes in selecting a methodology for distribution (42 U.S.C. §801(c)(7)).

67.     The APA allows a Court to set aside agency actions, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise contrary to law (5 U.S.C. § 706(2)(A)) and contrary to statutory authority (5 U.S.C. § 706(2)(C)).

68.     Treasury's decision to adopt the IHBG Metric for the basis of the Population Award, was arbitrary and capricious under the APA.  *See* 5 § 706(2)(A).

69.     Treasury's rationale for adopting the IHBG Metric was based on descriptions of the IHBG Metric that were plainly inaccurate and inferences about the IHBG Metric that were

unwarranted, including (i) that the IHBG Metric is "reliable and consistently-prepared" (ii) that IHBG Metric captures Tribal population; (iii) that Tribal governments are familiar with and scrutinize the IHBG Metric and (iv) that the IHBG Metric's reliance on Census Bureau data is a benefit for the purposes of disbursement of Title V Funds.

70.     Treasury's allocation ignores legislative intent and violates legislative authority. Congress directed Treasury to make payments to Tribal governments, which use enrollment data to provide services to their citizens.

71.     The IHBG Metric is facially flawed, as it contains population values for Tribal governments of zero.  The IHBG Metric relies upon race-based population data that is not an accurate or fair proxy of a Tribal government's obligation to provide essential services to its citizens.  Moreover, utilization of a "formula area" fails to take into account Tribal citizens who reside outside of the geographic area used by HUD to determine Tribal housing needs.  Treasury's allocation formula also fails to take into account the variation in Tribal government participation in the IHBG program and/or Tribal citizen participation in U.S. Census data gathering.

72.     Treasury's reliance upon the IHBG Metric resulted in undercounting of Tribal citizens and, thus, underpayment to numerous Tribal governments including the Prairie Band Potawatomi.  The IHBG Metric also exaggerates Tribal population for Tribal governments that provide housing assistance services to non-members within the Tribe's formula area, likely resulting in over-payment to such Tribal governments.

73.     Treasury failed to explain why the IHBG Metric, which by Treasury's own account, was "developed by HUD for the specific context of the IHBG program," should be used for the Population Award meant to compensate Tribal Governments for budget shortfalls, rather than capital improvements to subsidized housing.

74.    Treasury adopted the IHBG Metric, despite far better alternatives including the HUD Enrollment Metric and the ATE Metric.

75.    Treasury ignored the ATE Metric and the HUD Enrollment Data without explanation.  (*See* Allocation Document).  The FAQ, a post hoc rationalization, cannot rescue Treasury's flawed decision.

76.    The methodology adopted by Treasury is in violation of Treasury's obligation to distribute funds "based on increased expenditures of each such Tribal government" (42 U.S.C. 801(c)(7)), and therefore Treasury's action was "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  *See* § 706(2)(C).

77.    The APA also directs a Court to set aside agency actions that fail to observe procedure required by law.  5 U.S.C. § 706(2)(A).

78.    Title V of the CARES Act did not grant Treasury unlimited discretion to determine an appropriate method of allocating Title V funds to Tribal governments.  42 U.S.C. § 801(7).

79.    One of the explicit constraints on Treasury's discretion in determining how to award funds is that Treasury was required to consult with Tribal governments and the Secretary of the Interior.

80.    This directive reflected Congress' directive and implied Treasury's obligation to undertake a rational consultation with Tribal government and to reach a rational distribution.

81.    Tribal governments had no reason to expect that Treasury would select the IHBG Metric as the basis for awarding funds, particularly where Tribal governments had just submitted their ATE Metric to Treasury.  Tribal governments were, therefore, deprived of a reasonable opportunity to consult on the weaknesses of the IHBG Metric.

82.     The process conducted by Treasury failed to observe procedures required by law. 5 U.S.C. § 706(2)(D)).

83.     The process conducted by Treasury failed to comply with its statutory mandate to consult, and therefore Treasury's action was "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *See* 5 U.S.C. § 706(2)(C).

84.     The process conducted by Treasury reflected an implementation of statutory authority that was arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A).

85.     Based on the foregoing, Prairie Band Potawatomi is entitled to declaratory and injunctive relief described below.

## COUNT II:  Monetary Relief in the amount of $7,647,063.

86.     Prairie Band Potawatomi restates and realleges the preceding paragraphs and allegations as if fully stated herein.

87.     Treasury created a monetary remedy for the instant APA challenge by establishing a Judgment Fund on June 12, 2020 to resolve "any potentially adverse decision in litigation on this issue with respect to payments from the Fund to Tribal governments."  (Second Allocation Document.)

88.     Accordingly, upon Prairie Band Potawatomi's success on Count I, *supra*, Prairie Band Potawatomi is entitled to judgment directing Treasury to pay $7,647,063 to Prairie Band Potawatomi.

## PRAYER FOR RELIEF

Wherefore, the Prairie Band Potawatomi respectfully requests the Court:

1.      Enter judgment pursuant to 28 U.S.C. § 2201 and 5 U.S.C. § 706 (i) declaring that Treasury's use of the IHBG Metric to distribute Title V funds was arbitrary, capricious, an abuse of discretion, violated statutory authority and otherwise not in accordance with law and procedural requirements, and (ii) directing Treasury to fashion a remedy to correct Treasury's action, including by directing payment to tribes in proportion to their actual enrollment;

2.      Enjoin Treasury and Secretary Mnuchin from distributing, disbursing, or otherwise depleting any further that portion of remaining Title V Funds necessary to resolve the claims set forth in this Complaint, but in no event less than $7,647,063, until such time as Prairie Band Potawatomi's accurate actual population data is used and funds are distributed to Prairie Band Potawatomi consistent with the purpose of the CARES Act;

3.      Grant declaratory judgment directing Treasury to pay no less than $7,647,063 to Prairie Band Potawatomi based on Prairie Band Potawatomi's enrollment;

4.      Award the Prairie Band Potawatomi its reasonable attorney fees, costs, and such other and further relief as the Court deems just and proper.

Dated this 4th Day of January, 2021.


                              LIPPES MATHIAS WEXLER FRIEDMAN LLP

                              Carol E. Heckman*
                              James P. Blenk*
                                      50 Fountain Plaza, Suite 1700
                              Buffalo, New York 14202
                              Telephone: (716) 560-7744
                              checkman@lippes.com
                              jblenk@lippes.com
                              *Application for admission *Pro Hac Vice* forthcoming

                                      -and-

  _/s/_ Michael G. Rossetti
Michael G. Rossetti, DC Bar No. 477122
1900 K Street, NW, Suite 730
Washington, DC 20006
Telephone: (202) 888-7610
mrossetti@lippes.com

*Counsel for the Prairie Band Potawatomi Nation*